<u>SEALED</u>

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**
July 01, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____MLG_____
DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff<br><br>v<br><br>**TIMOTHY JOSEPH LEIWEKE**<br>Defendant | **INDICTMENT**<br><br>[Ct. 1: 15 U.S.C. § 1 – Conspiracy to Restrain Trade]<br><br>**1:25-CR-00344 ADA** |

**THE GRAND JURY CHARGES**:

## INTRODUCTION

1.  The charge in this Indictment arises from a scheme in which Defendant **TIMOTHY JOSEPH LEIWEKE** conspired with a competitor to rig the bidding to develop, manage, and operate an arena at a public university in Austin, Texas (the "Arena Project"). Specifically, **LEIWEKE** and a competitor agreed that the competitor would stand down and neither submit nor join an independent competing bid so that **LEIWEKE**'s company would win the Arena Project and derive its economic benefits. In exchange for the competitor's standing down, **LEIWEKE** represented that the competitor would receive certain subcontracts for the Arena Project and other consideration.

## GENERAL ALLEGATIONS

Unless otherwise noted, at all times relevant to this Indictment:

2.  Defendant **TIMOTHY JOSEPH LEIWEKE** was a resident of California and was the Co-Founder and Chief Executive Officer of Co-Conspirator Company-1 ("CC Company-1").

3.  CC Company-1 was a company initially headquartered in Los Angeles, California, and later headquartered in Greenwood Village, Colorado, that provided a variety of services to sports and entertainment entities.

4. Individual-1 was the Co-Founder of CC Company-1.

5. Co-Conspirator 1 ("CC-1"), not named as a defendant herein, was an executive at CC Company-1.

6. Co-Conspirator 2 ("CC-2"), not named as a defendant herein, was the Chief Executive Officer of Co-Conspirator Company-2 ("CC Company-2").

7. CC Company-2 was a company headquartered in New York, New York, that provided a variety of services to sports and entertainment entities.

8. Organization-1 was an entertainment holding company headquartered in New York, New York, that owned and operated several live entertainment venues.

9. Organization-2 was a live entertainment promotion and ticketing services company headquartered in Beverly Hills, California.

10. Individual-2 was the Chief Executive Officer of Organization-2.

11. Individual-3 was an executive at CC Company-2.

12. Organization-3 was a live entertainment promotion company headquartered in Austin, Texas.

13. Organization-4 was a private equity firm headquartered in Menlo Park, California.

14. The University was a public university in Austin, Texas.

15. The Arena was a multi-purpose arena that opened on the University's campus in or about 2022.

16. Whenever this Indictment alleges an act, deed, or transaction of a corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business affairs.

## COUNT ONE
### Conspiracy to Restrain Trade
### [15 U.S.C. § 1]

17.  Paragraphs 1 through 16 of this Indictment are re-alleged here.

18.  Beginning no later than in or about February 2018 and continuing until as late as in or about June 2024, in the Western District of Texas and elsewhere, Defendant

**TIMOTHY JOSEPH LEIWEKE**

and his co-conspirators, known and unknown to the Grand Jury, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by rigging the bidding for the Arena Project.  The combination and conspiracy engaged in by **LEIWEKE** and his co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  The combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among **LEIWEKE** and his co-conspirators.

### CHRONOLOGY OF THE OFFENSE

### LEIWEKE and CC-2 Agreed to Rig the Bidding for the Arena Project

19.  As early as in or about July 2016, CC Company-2 executives were aware that the University was contemplating replacing its multi-purpose arena with a new multi-purpose arena. In or about July 2016 and May 2017, a CC Company-2 executive contacted a University official to express CC Company-2's interest in developing the new arena.

20.  In or about 2017, **LEIWEKE** learned that the University was planning to issue a request for qualifications and proposal ("RFQ") for the Arena Project.

21. In anticipation of the RFQ's eventual release, which occurred in or about February 2018, CC Company-1 commenced discussions with various potential joint venture partners and service providers, including, among others, Organization-2 and Organization-3.

22. On or about September 29, 2017, **LEIWEKE** emailed Individual-1, Individual-2, and an employee of Organization-2 to state, in part, "[S]urprisingly, [CC Company-2] is bidding against us. I am assuming we can find a way to get [CC Company-2] some of the business, [food and beverage], project management-seat license, and get them to back down." **LEIWEKE** also stated, in part, "Let me know what you guys hear on [CC Company-2] as I never underestimate [CC Company-2's Co-Founder] in Texas." After receiving a response from Individual-1, **LEIWEKE** further stated, in part, "curious why they [*i.e.*, CC Company-2] want to compete directly."

23. Beginning no later than in or about November 2017, CC Company-2 took steps to put together a competing bid for the Arena Project by contacting various entities, including entities that specialized in arena construction, property development, facility management, and funding of real estate investments. CC Company-2 engaged in direct discussions with the University and began discussing potential bidding partners internally, including by email and text message.

24. On or about November 19, 2017, **LEIWEKE** emailed Individual-1 to state, in part, "We are told [that CC Company-2 is] bidding against us [for the Arena Project] . . . . I am surprised they want to now compete against us. Hard to give [CC-2] any business when he thinks he can do everything, including those things we do."

25. On or about November 29, 2017, **LEIWEKE** emailed Individual-1 and Individual-2 to state, in part, "Last time I heard, [CC Company-2] was going to bid on Austin

against us. More than happy talking to them about not bidding and doing [food and beverage], but no interest in working with them if they intend on putting in a bid."

26. In or about February 2018, **LEIWEKE** and CC-2 agreed that CC Company-2 would stand down and neither submit nor join an independent competing bid for the Arena Project. In exchange for CC Company-2's standing down from bidding, **LEIWEKE** agreed with CC-2 that CC Company-1 would include CC Company-2 in its bid and give CC Company-2 the subcontracts for the Arena's food and beverage services ("F&B") and premium seating sales ("Premium") (collectively, the "Subcontracts"), the exact terms of which would be negotiated later.

27. On or about March 5, 2018, CC-1 emailed individuals associated with Organization-4, stating that "[n]othing has been papered with [CC Company-2] but we clearly didn't want [CC Company-2] mobilizing against [CC Company-1]."

**CC Company-2 Stood Down So That LEIWEKE and CC Company-1 Would Win the Bid**

28. In or about March 2018, CC Company-1 submitted the sole qualified bid in response to the University's RFQ.

29. The University had contemplated a two-stage process, under which bidders deemed qualified in the first round would then submit bids in a second round. After reviewing CC Company-1's response—the only qualified response—the University notified CC Company-1 that it qualified.

30. Consistent with the bid-rigging conspiracy, CC Company-2 neither submitted nor joined an independent competing bid for the Arena Project.

31. On or about March 26, 2018, **LEIWEKE** emailed an Organization-4 executive, copying CC-1 and others, to state, in part, "We were very clever at putting together a partnership that scared everyone else away . . . . This allows us to dictate terms to [the University]."

32.     On or about December 18, 2018, the University conditionally awarded the contract for the Arena Project to CC Company-1 and its joint venture partners.

### CC Company-1 and CC Company-2 Discussed Subcontracts

33.     After CC Company-1 submitted its RFQ response, CC Company-1 and CC Company-2 communicated about the Subcontracts. On or about March 13, 2019, Individual-3 emailed CC-1 to state, in part, "As a reminder, our originally [sic] proposal was / is market [rate] and that is what we expected when we stood down on bidding for this business."

34.     On or about April 16, 2019, CC-2 emailed **LEIWEKE** to state, in part, "When I agreed to not have [CC Company-2] bid on the Austin arena project separately (at your request) and instead bid together, it was based on a commitment and representation from you (both written and verbal) that [CC Company-2] would receive the Premium Seating and F&B business for the project." CC-2 further stated, in part, "We expect to get what we bargained for by standing down on pursuing the Austin project based on your representations."

35.     Ultimately, CC Company-1 did not award CC Company-2 the Subcontracts nor introduce CC Company-2 employees to individuals associated with Organization-1. CC Company-1 handled F&B and Premium in-house, without subcontracting with another company.

### CC Company-1 Developed the Arena and Began to Reap Economic Rewards

36.     On or about December 30, 2019, the University entered into the contract for the Arena Project with CC Company-1 and its joint venture partners, and development began thereafter.

37.     On or about April 20, 2022, the Arena opened to the public, and CC Company-1 began receiving revenues, fees, and payments under the contract.

38. To date, CC Company-1 continues to receive revenues, fees, and payments for the management and operation of the Arena.

## MANNER AND MEANS OF THE CONSPIRACY

The conspiracy was carried out through the following manner and means, among others:

39. **LEIWEKE**, on behalf of CC Company-1, discussed and agreed with CC-2 to suppress and eliminate competition for the Arena Project by having CC Company-2 stand down and neither submit nor join an independent competing bid.

40. **LEIWEKE** further discussed and agreed with CC-2 that, in exchange for CC Company-2's standing down and not competing for the Arena Project, CC Company-1 would award to CC Company-2 the Subcontracts, as well as introduce individuals associated with Organization-1 to CC Company-2 employees.

41. After CC-2 agreed with **LEIWEKE** that CC Company-2 would stand down, CC Company-2 notified certain companies with which it was discussing forming a separate bid that it no longer sought to bid on the project with them.

42. In or about March 2018, CC Company-1 submitted its response to the University's RFQ. The University subsequently negotiated the contract for the Arena Project with CC Company-1. The contract was finalized on or about December 30, 2019.

43. CC Company-1 obtained revenues, fees, and payments under the Arena Project contract and continues to do so.

## TRADE AND COMMERCE

44.  The business activities of **LEIWEKE** and his co-conspirators that are the subject of this Indictment were within the flow of, and substantially affected, interstate commerce. For example:

    a.  The charged conspiracy restrained a commercial activity—the provision of services to develop, manage, and operate the Arena—that brought goods, services, people, and funds from other states to Texas, and vice-versa;

    b.  In developing the Arena, **LEIWEKE** and his co-conspirators used contractors and subcontractors that operated both in Texas and in states outside of Texas;

    c.  **LEIWEKE** and his co-conspirators received revenues, fees, and payments from customers located in Texas and outside of Texas; and,

    d.  **LEIWEKE** and his co-conspirators obtained financing for the project from companies located outside of Texas.

**ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.**

A TRUE BILL



FOR

_[signature]_
OMEED A. ASSEFI
Deputy Assistant Attorney
General Antitrust Division
U.S. Department of Justice

_[signature]_
SEAN FARRELL, Chief
New York Office
Antitrust Division
U.S. Department of Justice

_Steven Tugander_
STEVEN TUGANDER
RYAN D. BUDHU
PHILIP ANDRIOLE
SHIRIN MAHKAMOVA
Trial Attorneys
Antitrust Division
U.S. Department of Justice
201 Varick Street, Room 1006
New York, NY 100014